Complaint of the University of Texas Medical Branch at Galveston, et al.

The **UNIVERSITY OF TEXAS MEDICAL BRANCH AT GALVESTON et al.**, Plaintiffs-Appellants,

v.

**UNITED STATES of America**, Defendant-Appellee.

No. 75–2767.

United States Court of Appeals, Fifth Circuit.

Aug. 12, 1977.

---

**441**

GOLDBERG, Circuit Judge:

This case casts us adrift on muddied waters that lie at the convergence of two desultory streams of nineteenth century thought. On the one hand, Congress sought to ensure that navigable waterways remained free of obstructions, including sunken vessels. Accordingly, it prohibited the negligent creation of such obstructions by enacting the Wreck Act, a portion of the Rivers and Harbors Act of 1899 (1899 Act).[1] On the other hand, Congress sought to ensure that American shipping attracted investment capital that the threat of unlimited economic exposure might divert to England. Accordingly, it limited the shipowner's liability for losses caused without his "privity or knowledge" by the operation of his vessel by enacting the Limitation of Liability Act of 1851 (Limitation Act).[2] This appeal presents the important question whether a civil action by the United States to recover wreck removal expenses against one who negligently causes another's vessel to sink, obstructing a navigable waterway in violation of the 1899 Act, is subject to the Limitation Act.

The case at bar calls us to the unenviable task of deciding whether an impossibly obscure law (the 1899 Act) prevails over a hopelessly anachronistic one (the Limitation Act). The Limitation Act, two distinguished commentators have remarked, "has been due for a general overhaul for the past seventy-five years; seventy-five years from now that statement will be still true, except that the overhaul will then be one hundred and fifty years overdue."[3] Our opinion today is regrettably only a temporary drydock.

Dan H. Hinds, F. E. Billings, Houston, Tex., John L. Hill, Atty. Gen. of Tex., Jack Sparks, John Reeves, Austin, Tex., Adrian F. Levy, Galveston, Tex., L. Glen Kratochvil, Houston, Tex., Bryan F. Williams, Jr., Galveston, Tex., Alan S. Dale, Houston, Tex., for plaintiffs-appellants.

Edward B. McDonough, Jr., U. S. Atty., Robert Darden, Asst. U. S. Atty., Houston, Tex., Emmett B. Lewis, Admiralty & Shipping Section, William G. Kanter, Civ. Div., Dept. of Justice, Washington, D. C., for defendant-appellee.

Arthur L. Schechter, Houston, Tex., for other interested parties.

Before GOLDBERG and HILL, Circuit Judges and KERR,* District Judge.

* Senior District Judge of the District of Wyoming sitting by designation.

1. 33 U.S.C. § 401 et seq., (1970) (originally enacted as Act of Mar. 3, 1899, ch. 425, 30 Stat. 1151 et seq.). Sections 15, 16, 19 and 20, 33 U.S.C. §§ 409, 411, 412, 414 and 415 are collectively known as the Wreck Act. Sections of the Wreck Act are referred to herein solely according to their place in the Rivers and Harbors Act.

2. 46 U.S.C. §§ 181–89 (1958) (originally enacted as Act of Mar. 3, 1851, ch. 43, 9 Stat. 635).

3. G. Gilmore & C. Black, *The Law of Admiralty* 677 (1st ed. 1957). In the second edition of the treatise, the authors add: "The developments of the past twenty years suggest that, although the Limitation Act may never come in for a 'general overhaul', its most likely fate, if it is not repealed outright, is that it will be judicially nibbled to death." *Id.* at 846 (2d ed. 1975) [hereinafter all references are to second edition]. Ours is neither the first nor, doubtless, the last bite.

On the other hand, with respect to the Rivers and Harbors Act, a distinguished jurist has remarked wryly, "clarity of draftsmanship is not [its] hallmark."[4] We daresay the Act will not qualify for the hall of fame even after our attempt at exegesis.[5]

Nevertheless, we decide today that the purposes of the 1899 Act prevail, the Limitation Act is inapplicable, and the potential liability of a negligent party for wreck removal costs under the 1899 Act is not limitable.

I.

Appellants' vessel, the M/V Ida Green, an oceanographic research ship, collided with a Norwegian tanker, the M/T Bow Elm, in Galveston Bay Channel on April 24, 1974. A moment later the M/T Bow Elm collided with the A. MacKenzie, a dredge belonging to the Army Corps of Engineers.

The collision caused the A. MacKenzie to sink in midchannel. The ship was a total loss. Worse, the wreck posed a danger to shipping in one of the busiest waterways on the Gulf Coast.

The United States acted immediately. It removed the wreck at a total cost of $3,000,000. On October 24, 1974, the appellants filed a complaint for exoneration from or limitation of liability. Appellants claimed $240,000 as the value of the M/V Ida Green. They sought to limit their total liability to that sum pursuant to § 183(a) of the Limitation Act of 1851, 46 U.S.C. § 183(a).[6] The district court thereupon began, as a matter of course, the limitation proceeding by which all successful claimants against the appellants would share in the $240,000 fund.

Faced with $3,000,000 in wreck removal costs alone and a maximum $240,000 recovery within the limitation proceeding, the government's course was clear. On December 9, 1974, it moved for an order declaring that its claim for wreck removal costs was not subject to the restraining order filed in the limitation proceeding and freeing the government to commence an in personam action against the appellants outside the limitation proceeding. On May 9, 1975, the district court granted the government's motion.

The owners of the M/V Ida Green have taken this interlocutory appeal from that order. Because the government claims only that its recovery will not be subject to limitation in the event the court finds the M/V Ida Green at fault, for purposes of this interlocutory appeal we take as true the government's allegation that the Ida Green's negligence proximately caused the wreck of the A. MacKenzie. Similarly, because the government concedes for this appeal that the Ida Green's negligence was without appellants' "privity or knowledge", we shall assume that appellants have satisfied that condition precedent to invoking the Act. See note 6, supra.[7]

II.

The district court offered no reasons for its decision that the United States' claim

4. United States v. Moran Towing & Transportation Co., 374 F.2d 656, 670 (4th Cir. 1967) (Sobeloff, J., dissenting).

5. It might be said of portions of the 1899 Act, as two commentators have said of a portion of the 1851 Act: "No doubt when more obscure statutes are drafted, the Congress will draft them . . . ." G. Gilmore & C. Black, supra note 3, at 845.

6. Section 183(a) of the Limitation Act provides in pertinent part:
 The liability of the owner of any vessel, whether American or foreign, for any . . . loss, damage or injury by collision, or for any act, matter, or thing, loss, damage, or forfeiture, done, occasioned, or incurred, without the privity or knowledge of such owner or owners, shall not [except in cases of personal injury] . . . exceed the amount or value of the interest of such owner in such vessel, and her freight then pending.

7. It might be, of course, that although a shipowner's negligently causing its own ship to sink was without its privity or knowledge because the actual negligence was that of a crew on the high seas, the shipowner's failing to remove the vessel once wrecked is within its privity or knowledge as a violation of its duty under § 15 of the 1899 Act. We are not concerned with this possibility in the case at bar for reasons explained, infra.

for wreck removal costs was not limitable other than that "the great weight of authority" supported it. In fact, however, none of the decisions cited involved the government's claim against a negligent third party; all involved the government's claims against owners of the wreck that the government removed.

None of the appellants in the case at bar was an owner of the sunken dredge, the A. MacKenzie. This appeal turns on whether that fact is decisive. In order to assess its significance, we need carefully to examine §§ 10 and 15 of the Rivers and Harbors Act, 33 U.S.C. §§ 403, 409. We shall then show that negligent owners and negligent non-owners have been treated similarly for purposes of affording the government civil remedies under §§ 10 and 15 for wreck removal; that the government's implied civil remedy under § 15 for wreck removal costs against owners has uniformly been held to be non-limitable; and that the policies underlying the non-limitability of the government's recovery against an owner

---

**8.** 33 U.S.C. § 403 (Section 10) provides in pertinent part:

The creation of any obstruction not affirmatively authorized by Congress, to the navigable capacity of any of the waters of the United States is prohibited; and it shall not be lawful to build or commence the building of any wharf, pier, dolphin, boom, weir, breakwater, bulkhead, jetty, or other structures in any port, roadstead, haven, harbor, canal, navigable river, or other water of the United States, outside established harbor lines, or where no harbor lines have been established, except on plans recommended by the Chief of Engineers and authorized by the Secretary of the Army.

**9.** Section 12, 33 U.S.C. § 406, provides:

Every person and every corporation that shall violate any of the provisions of sections 401, 403, and 404 of this title or any rule or regulation made by the Secretary of the Army in pursuance of the provisions of section 404 of this title shall be deemed guilty of a misdemeanor, and on conviction thereof shall be punished by a fine not exceeding $2,500 nor less than $500, or by imprisonment (in the case of a natural person) not exceeding one year, or by both such punishments, in the discretion of the court. And further, the removal of any structures or parts of structures erected in violation of the provisions of the said sections may be en-

---

are equally applicable to its recovery against a negligent non-owner of the wreck.

## A.

Section 10 of the Rivers and Harbors Act, 33 U.S.C. § 403, prohibits "[t]he creation of any obstructions not affirmatively authorized by Congress."[8] Section 12 of the 1899 Act both provides the criminal penalty for a violation of § 10 and authorizes the United States to enforce by injunction "the removal of any structures" erected in violation of § 10.[9]

Although the 1899 Act specifically addresses the problem of sunken vessels only in § 15, 33 U.S.C. § 409, this court has held that § 10's prohibition of "obstructions" includes sunken vessels. *United States v. Cargill, Inc.*, 367 F.2d 971, 975 (5th Cir. 1966), *aff'd on other grounds sub nom. Wyandotte Transportation Co. v. United States*, 389 U.S. 191, 88 S.Ct. 379, 19 L.Ed.2d 407 (1967); *United States v. Raven*, 500 F.2d 728, 731 (5th Cir. 1974).[10]

---

forced by the injunction of any district court exercising jurisdiction in any district in which such structures may exist, and proper proceedings to this end may be instituted under the direction of the Attorney General of the United States.

Section 12 thus makes the creation of an "obstruction" a criminal offense, while apparently reserving the injunctive power only for the removal of "structures." The Supreme Court filled in this lacuna by reading the grant of injunctive authority broadly, to cover all § 10 offenses, in *United States v. Republic Steel Corp.*, 362 U.S. 482, 80 S.Ct. 884, 4 L.Ed.2d 903 (1960) (injunction would lie to compel removal of industrial waste obstructing waterway).

**10.** This court's reading of § 10 has not been universally shared, as we recognized in *Cargill*:

Several cases, *Loud v. United States*, 286 F. 56 (6 Cir. 1923); *The Manhatten*, 10 F.Supp. 45 (D.C.Pa.1935), aff'd 85 F.2d 427 (3 Cir. 1935), cert. denied, sub nom *United States v. The Bessemer*, 300 U.S. 654, 57 S.Ct. 432, 81 L.Ed. 864 (1937); *In re Eastern Transportation Co.*, 102 F.Supp. 913 (D.C.Md.), aff'd sub nom *Ottenheimer v. Whitaker*, 198 F.2d 289 (4 Cir. 1952); *United States v. Bethlehem Steel Corp.* (The Texmar), 319 F.2d 512 (9 Cir. 1963), have concluded that the Sections 10 and 12 are not applicable to sunken vessels.

■ Section 15 of the Rivers and Harbors Act, 33 U.S.C. § 409, part of the "Wreck Act" proper, specifically addresses the problem of obstructions caused by sunken vessels. Part of the difficulty in construing § 15 arises from its division into three operative clauses. The first clause prohibits the intentional or negligent sinking of a vessel in navigable waters.[11] The second clause applies to all sinkings, whether negligent or accidental. It provides that the owner of the wreck must mark it with a buoy or beacon. The third clause, which also applies to all sinkings, whether innocent or negligent, prescribes that the owner of the wreck shall remove it on pain of being considered to have abandoned the vessel, subjecting it to removal and sale by the government.

Although § 12 of the Act specifically makes violations of § 10 remediable by injunction, the Act provides only a limited remedy for violations of § 15. Section 16, 33 U.S.C. § 411, provides criminal penalties, including fine or imprisonment, for violating § 15. Sections 19 and 20, 33 U.S.C. §§ 414, 415, authorize the government to sell a wreck deemed abandoned by the owner and accord it rights to the proceeds.

This curious statutory structure has given rise to a multitude of questions. What is the relation between § 10 and § 15? Does § 15 exclusively govern the problem of wrecked vessels, or does it share the field with § 10? As we have seen, in *Cargill* this court answered that § 10's prohibition of "obstructions" included in its scope wrecked vessels. Does a negligent owner who fails to perform his duty to remove a wreck suffer only the consequences of abandonment pursuant to the third clause, thereby insulating himself from any further liability? Do §§ 16, 19 and 20, which provide the criminal penalty and the government's entitlement to the proceeds of selling an abandoned wreck, comprise the government's exclusive remedy for violations of § 15? As we shall see next, the Supreme Court held in *Wyandotte Transportation Co. v. United States, supra,* that the government has available against negligent parties other "implied" remedies, including injunctive relief and an action for reimbursement of wreck removal expenses when the government removes the wreck.

Once it is recognized that the government can sue for removal expenses under the 1899 Act, are the purposes of that Act and the potential recovery by the government constrained by the Limitation Act? Does the answer to this question depend on which of the three clauses of § 15 apply? Is

367 F.2d at 976. *See also United States v. Moran Towing & Transportation Co., supra,* 374 F.2d at 662. Furthermore, our approach to § 10 presents certain problems. As we shall see, § 15 makes unlawful only the negligent sinking of a vessel, thereby obstructing navigable waters. By its terms, § 10 would prohibit even the innocent creation of such an obstruction. Our cases have not addressed the anomaly caused by construing a general statute, § 10, as apparently creating a strict liability offense for conduct that a specific statute, § 15, proscribes only if it is negligent.

11. Section 15, 33 U.S.C. § 409, provides:
 It shall not be lawful to tie up or anchor vessels or other craft in navigable channels in such a manner as to prevent or obstruct the passage of other vessels or craft; or to voluntarily or carelessly sink, or permit or cause to be sunk, vessels or other craft in navigable channels; or to float loose timber and logs, or to float what is known as "sack rafts of timber and logs" in streams or channels actually navigated by steamboats in such manner as to obstruct, impede, or endanger navigation. And whenever a vessel, raft, or other craft is wrecked and sunk in a navigable channel, accidentally or otherwise, it shall be the duty of the owner of such sunken craft to immediately mark it with a buoy or beacon during the day and a lighted lantern at night, and to maintain such marks until the sunken craft is removed or abandoned, and the neglect or failure of the said owner so to do shall be unlawful; and it shall be the duty of the owner of such sunken craft to commence the immediate removal of the same, and prosecute such removal diligently, and failure to do so shall be considered as an abandonment of such craft, and subject the same to removal by the United States as provided for in sections 411 to 416, 418, and 502 of this title.
 The phrase "voluntarily or carelessly" has been interpreted to mean "intentionally or negligently." *Wyandotte Transportation Co. v. United States, supra,* 389 U.S. at 207, 88 S.Ct. at 388; *United States v. Ohio Valley Co., Inc.,* 510 F.2d 1184, 1188 n. 7 (7th Cir. 1975).

there a difference in the limitability of the government's recovery when it invokes only the first clause, which is applicable to negligent parties, than when it invokes the second or third clauses, which are applicable only to owners?

These and related questions simply could not have arisen prior to the Supreme Court's decision in *Wyandotte*. Prior to *Wyandotte*, indeed, a sunken vessel's owner rarely had occasion to invoke the Limitation Act against the government since the owner could rely on his primary right of abandonment under § 15. That is, the language of the third clause of § 15 suggests that an owner may *either* remove his vessel or abandon it to the government. If he abandons the vessel, § 19 prescribes that the government may proceed in rem against the wreck itself. Since the Limitation Act would in any event merely restrict the government to an in rem recovery, abandonment usually made invocation of the Limitation Act superfluous. In another sense, the notion of an in rem limit to the shipowner's liability, obtainable under either the Limitation Act or the Rivers and Harbors Act, seemed to suggest that the two statutes were complementary, or at the least not inconsistent.

With *Wyandotte*, this happily coincident scheme of statutory protection for shipowners disintegrated.

### B.

In *Wyandotte Transportation Co. v. United States, supra*, 389 U.S. 191, 88 S.Ct. 379, 19 L.Ed.2d 407, the Court held that the Rivers and Harbors Act impliedly accorded the government civil remedies to secure the removal of a wreck or regain the expenses of removal against parties responsible for negligently sinking a vessel in violation of § 15. By recognizing that the government was not limited to an in rem recovery against an abandoned vessel, but could sue in personam the parties negligently responsible for the wreck, *Wyandotte* opened a wide breach between the Limitation Act and the newly-construed Rivers and Harbors Act.

Two consolidated cases were involved. In the first, the government sought a declaratory judgment that the allegedly negligent owners, managers, charterers, and insurers of two sunken barges were responsible for removing the barges from a navigable river. In the second, the government had itself removed a barge that obstructed the river. The government sued in rem against the barge and her cargo and in personam against the barge's owner and negligent non-owners of the barge—specifically, the owner of the tug that had been pushing the barge when it sank and the owner of the cargo—for the costs of removing the wreck. The district court had granted summary judgment against the government's in personam suits and held that the United States was limited to an in rem recovery against the sunken vessels and their cargoes. *United States v. Cargill, Inc.* 1964 A.M.C. 1742 (E.D.La.). This court reversed, holding that § 15's abandonment alternative to removal applied only to innocent owners of wrecks and that §§ 10 and 12 authorized an injunction or suit for reimbursement. *United States v. Cargill, Inc., supra*, 367 F.2d 971. The Supreme Court did not reach the question whether §§ 10 and 12 applied, but found the requested remedies implied by § 15 as against all negligent defendants.

In making available to the government the power to seek an injunction mandating the removal of a wreck or to pursue an action for reimbursement of wreck removal expenses, the Court thus drew no distinctions between negligent owners of the wreck and negligent non-owners. Indeed it rejected the claim that negligent owners of the wreck should be treated differently—i. e., exonerated from in personam liability—because of their right to abandon the vessel. But because the case stood only at the stage of an in personam action by the government answered by defendant's motion for summary judgment, the Court did not have occasion to determine whether any negligent shipowner, whether an owner or non-owner of the wreck, could again return its potential liability to an in rem level by

invoking the Limitation Act.[12] The Court specifically reserved the question whether the Limitation Act applies to a civil action under § 15 of the Rivers and Harbors Act. *Wyandotte, supra*, 389 U.S. at 205 n. 17, 88 S.Ct. at 388.

Although the holding of the Court in *Wyandotte* leaves the applicability of the Limitation Act an open question, the policy arguments by which the Court reached its holding help answer that question. Accordingly, at least in cases involving owners of wrecks, courts have uniformly read *Wyandotte* as implying that in personam liability could not be limited in a Wreck Act case. *See Hines, Inc. v. United States*, 551 F.2d 717 (6th Cir. 1977); *In re Pentzien, Inc.*, 1974 A.M.C. 1201 (D.Neb.1974); *In re Scranton Industries, Inc.*, 358 F.Supp. 7 (S.D.N.Y.1972); *In re Pacific Far East Line, Inc.*, 314 F.Supp. 1339 (N.D.Cal.1970), *aff'd on separate issue*, 472 F.2d 1382 (9th Cir. 1973). *See also In re Chinese Maritime Trust, Ltd.*, 361 F.Supp. 1175 (S.D.N.Y. 1972), *aff'd*, 478 F.2d 1357 (2d Cir. 1973), *cert. denied*, 414 U.S. 1143, 94 S.Ct. 894, 39 L.Ed.2d 98 (1974).

In order to see why *Wyandotte* has universally been read to oust the Limitation Act from a suit for wreck removal costs against an owner who violates § 15, and in order to discern whether the Limitation Act is similarly inapplicable in a suit for wreck removal costs against a violator of § 15 who does not own the sunken vessel, we need carefully to examine the policy arguments deployed by the Court.

To be sure, the Court relies on these policy arguments only for its recognition that the government is entitled to implied civil remedies. It does not relate those policies directly to the possible application of the Limitation Act. Nevertheless two themes emerge that underlie both inquiries. First, the critical distinction is not between owners of the wreck and non-owners, but between negligent and innocent parties. The Court is emphatic that the negligent must not be allowed to shift the loss arising

from a sunken vessel onto the innocent. Second, the Court stressed that once having recognized that the government could in principle obtain an injunction against the responsible parties to remove a wreck, it follows that when the government removes first it must be able to recover its expenses directly; mere in rem recovery pursuant to §§ 19 and 20 plus any criminal fines authorized by § 16 usually will not cover those expenses and will thus penalize the government for promptly removing a wreck. We shall first illustrate those themes in the *Wyandotte* context and then apply them to the question of limitation.

The *Wyandotte* Court was powerfully moved by the equities of that case. "There is no indication anywhere . . . that Congress might have intended that a party who negligently sinks a vessel should be shielded from personal responsibility." 389 U.S. at 200, 88 S.Ct. at 385. Following its earlier admonition in *United States v. Republic Steel Corp., supra*, 326 U.S. at 491, 80 S.Ct. at 890, to interpret the Wreck Act "charitably in light of the purpose to be served," the Court painted with a broad brush to ensure that the wrongdoer would not escape responsibility.

The Court reasoned that the United States was entitled to implied civil remedies because in many cases the combination of the "meager monetary penalties" of § 16 "and the Government's *in rem* rights [after abandonment and sale pursuant to § 19] would not serve to reimburse the United States for removal expenses." *Wyandotte Transportation Co. v. United States, supra*, 389 U.S. at 202, 88 S.Ct. at 386. Thus, the government could seek an injunction ordering the negligent owner in one case to remove the vessel because "[d]enial of such a remedy . . . would permit the result, extraordinary in our jurisprudence, of a wrongdoer shifting responsibility for the consequences of his negligence onto his victim." Id. at 204, 88 S.Ct. at 387. Similarly, the government could seek reimbursement of wreck removal costs against the responsi-

---

**12.** For example, the owner of the tug might have attempted to invoke the Limitation Act with respect to the tug's share of wreck removal costs in *Wyandotte.*

ble parties in the other case because "[h]aving properly chosen to remove such a vessel, the United States should not lose the right to place responsibility for removal upon those who negligently sank the vessel." *Id.* at 204, 88 S.Ct. at 387.

It is critical that, although reserving the question of the applicability of the Limitation Act, *Wyandotte* appears to stand for the proposition that the United States must be afforded complete relief against the parties responsible for the sinking. Expressing doubt that Congress intended that "the Government's commendable performance of Wyandotte's duty [to remove the vessel] must be at Government expense," the Court sought by providing implied civil remedies to ensure that "the Government would [not] be subject to a financial penalty for the correct performance of its duty to prevent impediments in inland waterways." *Id.* at 205, 88 S.Ct. at 387 (footnote omitted).

In light of these policy arguments, it is not surprising that *Wyandotte* has been interpreted as impliedly ousting the Limitation Act from application to the government's recovery of wreck removal expense. The first policy theme is that the critical distinction is between negligent and innocent parties. "[I]n any case in which the [1899] Act provides a right of removal in the United States, the exercise of that right should not relieve negligent parties of the responsibility for removal." 389 U.S. at 205, 88 S.Ct. at 387. To be sure, in order to invoke the Limitation Act a shipowner must not have been personally negligent, i. e., the negligence of his ship's master or crew must not have been within his "privity or knowledge." *See* note 6, *supra.* Nonetheless the application of the Limitation Act would create "the anomalous situation . . . of a shipowner whose vessel had negligently obstructed navigation liable under the Rivers and Harbors Act limiting its liability under the Limitation Act because he was personally uninvolved in the casualty." 5 J.Mar.L. & Comm. 671, 678 (1974). The other side of this "anomalous situation" is, of course, that if the owner of the wreck limits his liability, the bulk of the expense of removing the wreck will be borne by an innocent party—the government.

The second theme stresses this latter point. The government is entitled to compel the responsible parties to remove the wreck. If the government itself removes, it should not be penalized for its prompt action and should be able to recover the expenses of removal. Just as the Court thought § 16's criminal fine and the in rem recovery authorized by § 19 insufficient to reimburse the government, so limiting the government to an in rem recovery in a civil suit subject to the Limitation Act would in most cases preclude the government from securing full reimbursement. The government's victory in *Wyandotte* would be virtually meaningless if, having cleared one hurdle to full reimbursement, the Limitation Act should merely reinstate that obstacle at another procedural juncture.

Although it is thus not surprising that courts should rely on *Wyandotte* to oust the Limitation Act in suits for wreck removal expenses against owners, the ground relied on at least in part by such courts is not as broad as the policy arguments of *Wyandotte* might suggest. Adherence to that narrow ground of decision would allow the non-owner defendants in the case at bar to invoke the Limitation Act and would prevent the United States from being made whole.

### C.

When the government seeks to recover wreck removal expenses from the owner who negligently causes his own vessel to sink, it may bring to bear both the first and third clauses of § 15. That is, the owner has violated the first clause by negligently sinking the vessel and the third clause by failing to perform his personal statutory duty to remove the wreck. Assuming as we do in the case at bar that the owner's violation of the first clause is without his "privity or knowledge" because the negligent acts were committed by the master or crew of the vessel rather than by the owner personally, the owner is free to invoke the Limitation Act for liability arising from the

sinking. But the owner's violation of the third clause may be different. Faced with an explicit statutory duty to remove the wreck, the owner has elected to abdicate his duty and face the consequences of abandonment.

Courts that have denied limitation in this situation have characterized the latter statutory breach as within the owner's "privity or knowledge." *See e. g., In re Chinese Maritime Trust, Ltd.*, 361 F.Supp. 1175, 1177 (S.D.N.Y.1972), *aff'd* 478 F.2d 1357 (2nd Cir. 1973); *In re Scranton Industries, Inc.*, 358 F.Supp. 7, 8 (S.D.N.Y.1972); *In re Pacific Far East Line, Inc.*, 314 F.Supp. 1339, 1349 (N.D.Cal.1970).[13] It follows that the owner cannot invoke the Limitation Act with respect to liability arising from his failure to remove the wreck.

Courts have sometimes seized on this argument to steer clear of a collision between the Limitation Act and the Rivers and Harbors Act. For if the statutory removal provision is always within the owner's "privity or knowledge", then an owner can never invoke the Limitation Act in a suit by the government for wreck removal expenses. The argument obviates the need to choose between the two Acts in suits against owners of the wreck.

This ground of decision is narrow in the sense that it would not foreclose the Limitation Act to non-owners of the wreck, who have no equivalent statutory duty to remove. The ground of decision is broad, however, in the sense that it would preclude even an innocent owner from invoking the Limitation Act. It must be remembered that the statutory duty to remove the wreck applies to owners even if the wreck was not negligently sunk. *A fortiori*, it also applies to owners of a negligently sunk vessel who are not themselves negligent.

By eschewing a principle of decision that would cleave more closely to the policy arguments adduced in *Wyandotte* by differentiating between innocent and negligent parties, a court that relies solely on this argument will place negligent non-owners in a better position than innocent owners. A court that relies solely on "privity or knowledge" to determine whether the government's civil suit is subject to the Limitation Act will thus inevitably reach results that squarely conflict with the policies underlying *Wyandotte*. By urging us to hold that the presence of "privity or knowledge" is the sole ground for denying limitation, appellants would have us reach such a result in the case at bar.

In the normal situation, of course, the owner of a negligently sunken vessel will not be the government but a private party. Suppose that vessel A's crew negligently causes vessel B to sink. The owner, pilot, and crew of vessel B are entirely innocent. The innocent owner of vessel B nevertheless has a statutory duty to remove the wreck. Indeed, according to the third clause of § 15 he would have such a duty even were the vessel accidentally wrecked.[14]

13. These decisions have been criticized in the literature for relying on "privity or knowledge" rather than *Wyandotte's* distinction between negligent and innocent parties. Thus, one commentator has written of *Chinese Maritime*:

[O]ne may ask how the shipowner has breached its duty [by failing to remove its wreck] if it is merely asserting a right of limitation protected by statute. *The Court would have been on sounder ground had it held that removal expenses were not limitable when the loss occurred negligently.* This would have resolved the policy issue left open in *Wyandotte* in a straightforward fashion without making major incursions into the well-established Limitation Act principle of "privity or knowledge" . . . .. The concept of privity has traditionally been based on the owner's personal involvement in the cause of the loss of the vessel. In *Chinese Maritime Trust* the concept becomes an *after-the-loss presumption of fact.* The cause of the vessel's loss and the owner's participation as distinguished from his employee's participation in the casualty are irrelevant for purposes of overcoming the factual presumption. Indeed, by focusing on a redefinition of "privity or knowledge", instead of on the scope and weight of the remedies provided by the removal statute, the courts in *Chinese Maritime Trust* are no longer under the constraints of *Wyandotte*.

5 J.Mar.L. & Comm. 671, 679–80 (1974) [emphasis added].

14. The owner of vessel B also has a duty to locate and mark the wreck, as prescribed by the second clause of § 15.

The faultless owner's presumed knowledge of his duty to remove would prevent him from limiting his liability for the wreck, however, if we accept this kind of "privity or knowledge" as precluding invocation of the Limitation Act.[15] Once the owner of B removes the wreck, he will sue the owner of vessel A, which caused the wreck, to recover his expenses. At this point, however, the owner of B, who by hypothesis was not in "privity or knowledge" of his § 15 violation, will invoke the Limitation Act. The result will likely be that the innocent owner of A will be unable fully to recover the costs of wreck removal. This "would permit the result, extraordinary in our jurisprudence, of a wrongdoer shifting responsibility for the consequences of his negligence onto his victim," *Wyandotte Transportation Co. v. United States, supra,* 389 U.S. at 204, 88 S.Ct. at 387, by forcing the innocent party to bear the entire cost of removal with but a limited right of recovery. Accepting the appellants' argument that limitation can be avoided only if the limitation claimant has "privity or knowledge" would entail reaching this inequitable result.

The point can be made another way, albeit with slightly less moral force. Suppose the same hypothetical as before, with the sole difference that the crews of vessels A and B are jointly and equally negligent causes of B's sinking. The owner of B fails to remove the wreck. In order promptly to clear the channel of a dangerous obstruction, the United States removes the wreck. The government then sues the owners of A and B respectively for wreck removal expenses.

There is no doubt that the government can recover from the owner of B. The latter's failure to remove placed him "in privity or knowledge." Consequently B's liability is unlimited. But what of the equally negligent owner of A? Having no statutory duty to remove, he is not in "privity or knowledge." On appellants' argument, then, the owner of A can successfully invoke the Limitation Act and limit his liability. Although equally negligent, the parties share unequal burdens.[16] Once again, the allocation of the burden of wreck removal expenses is inconsistent with the relative fault of the parties. Once again, a negligent party has shifted part of the loss attributable to his negligence onto his "victim," though the victim is now himself equally negligent.

The case at bar differs from the normal situation in that the owner of the wreck

15. If the owner of vessel B refuses to remove the wreck, he is then in privity or knowledge of his statutory breach. Can the United States recover the cost of removing the wreck from the owner of B? It is in the government's interest to sue the owner of B, who cannot limit his liability, if any, because the government's recovery from the owner of A would be, under this hypothetical, limited.

 Certainly nothing in *Wyandotte* would suggest that the United States has a cause of action for wreck removal expenses against an innocent owner either when the owner's vessel was negligently sunk by another or when the vessel was accidentally or non-negligently sunk. *See Wyandotte, supra,* 389 U.S. at 197 n. 6, 88 S.Ct. at 384. This suggests that the owner of vessel B in our hypothetical would be wise to breach its statutory duty to remove.

 This court faced a related question in *In re Marine Leasing Services, Inc.,* 471 F.2d 255 (5th Cir. 1973). The lower court had found that a barge, chartered and operated by the defendants and removed by the United States after it sunk, was caused to sink by a hurricane, not by any act of negligence. The United States sought to recover for the expenses of locating, marking, and removing the barge. This court held that the United States could not recover removal expenses. The court reasoned that because § 15 refers only to voluntarily or carelessly sunken vessels, the United States had no right to recover removal costs with respect to an innocent or non-negligent sinking. The court also held, however, that the government could recover the expenses of locating and marking the barge "since the statute casts a duty on the owner to make a vessel even when it is 'accidentally' sunk." *Id.* at 257.

 The obvious difficulty with this result is that both the second and third clauses of § 15 provide that their respective duties of marking and removing the wreck shall devolve on owners even when the owner's vessel was accidentally or non-negligently sunk. The court's basis for distinguishing between the duty to remove and the duty to mark remains unclear.

16. This is true assuming that the government's in rem recovery against A is less than half the cost of removing the wreck. As the case at bar indicates, that assumption will often be correct.

was the United States.[17] If we accept appellants' argument that the only ground for denying limitation is that appellants were in "privity or knowledge", then we would be compelled to reverse the district court and hold that appellants are entitled to limit their liability. Unlike owners of wrecks, who have a statutory duty to remove, the appellants, as non-owners, had no such duty under the third clause of § 15.

■ The government argues that even if we accept appellants' argument that denial of limitation is contingent on a finding of "privity or knowledge," the appellants are not entitled to limitation here because, as the negligent parties, they had a duty to remove. The government concedes, as it must, that § 15 does not specify such a duty. But the government contends that because it could have obtained an injunction forcing appellants to remove, it may be said that appellants had a duty to remove. This conclusion is mistaken. The government did not seek or obtain an injunction. Unlike owners, who know that they must remove the wreck whatever their innocence or negligence, the appellants could not have known in advance of litigation that they would be held responsible for removing the wreck. Hence it is both misleading and unfair to say that appellants' failure to remove placed them in privity or knowledge of a breach of the duty to remove.

Consequently, accepting appellants' notion that privity or knowledge is the sole ground for denying limitation would compel a result that directly conflicts with the policy objectives *Wyandotte* sought to realize. The innocent party—here the United States—would bear the full burden of removing the wreck with only a limited right to recover against the parties that negligently caused the wreck. The result is thus discordant with the first theme of *Wyandotte* inasmuch as a negligent party shifts responsibility for the consequences of his negligence.

The result clashes with the second theme of *Wyandotte* as well. Limiting the United States to an in rem recovery against appellants would subject the government "to a financial penalty for the correct performance of its duty to prevent impediments in inland waterways." *Wyandotte Transportation Co. v. United States, supra,* 389 U.S. at 205, 88 S.Ct. at 387.

■ *Wyandotte* and *Cargill* establish that the United States could in principle have obtained complete relief against appellants by injunction.[18] Had the government obtained an injunction, appellants would have borne the full cost of removing the wreck. It follows that we should not penalize the government for removing the wreck itself instead of proceeding via the slower

17. Although theoretically free to sue *qua* owner in tort, the United States seeks relief in the case at bar *qua* sovereign, under the authority of the Rivers and Harbors Act. We thus treat the government's removal of its vessel, the A. MacKenzie, as having been effected in its sovereign capacity. *See In re Sincere Navigation Corp.*, 327 F.Supp. 1024 (E.D.La.1971).

18. This court held in *Cargill* that §§ 10 and 12 of the 1899 Act authorize the United States to obtain an injunction against the negligent owners of a wreck to remove that obstruction. Our reasoning was that a sunken vessel was an "obstruction" within the terms of § 10, and that § 12 specifically authorizes injunctive relief against violations of § 10. Because § 12 makes subject to injunctive relief "[e]very person and every corporation" that violates § 10, there can be no argument that injunctive relief is limited to owners of the wreck as opposed to negligent non-owners. Hence the United States could have sought injunctive relief under

§§ 10 and 12 against the appellants in the case at bar.

Similarly, *Wyandotte* is authority for the proposition that § 15 authorizes the government to seek an injunction against even a non-owner of the wreck. The language of that opinion is broad. The Court does not refer to owners or non-owners, but to negligent parties:

The Government may, in our view, seek an order that a *negligent party* is responsible for rectifying the wrong done to maritime commerce by a § 15 violation.

389 U.S. at 204, 88 S.Ct. at 387 (emphasis added). More important, in the case to which this language pertains, the government sought declaratory relief not merely against the owners but also against the managers, charterers, and insurers of the two sunken barges. *Id.* at 194, 88 S.Ct. at 382. Therefore *Wyandotte's* holding is not, as the appellants would have it, limited to owners of the wreck sought to be removed.

route of obtaining an injunction. Had the government obtained an injunction, appellants would have removed the wreck at no direct cost to the public. The public, however, would necessarily have borne the indirect costs stemming from the continued obstruction of a navigable waterway.

To deny the United States full reimbursement for properly exercising its power to remove a wreck would constitute a severe disincentive to its choosing this more efficient course of action. One would expect that in cases where the cost of removal exceeds the government's potential recovery within a limitation proceeding, the United States would simply decline to remove the wreck itself and seek an injunction compelling the negligent parties to remove. Maritime commerce and the public would then suffer the delays inherent in this injunctive process.[19]

It is bromidic to say that equity follows the law. But if there be any chemistry left in this maxim then the government's recovery of wreck removal expenses should represent a remedy as complete in the relief it affords as the equitable injunctive remedy. The coin thus has two faces, but in either case, *Wyandotte* tells us, that coin should be paid by the negligent party.

In order fully to effectuate the policies of the Rivers and Harbors Act as interpreted by the Supreme Court in *Wyandotte*, then, it is impossible to give full effect to the Limitation Act. It was possible to find those Acts consistent and, indeed, complementary as long as the shipowner was able effectively to limit his liability merely by abandoning his vessel. Once the Court announced in *Wyandotte* that the United States could sue the negligent owner personally for wreck removal expenses even though the latter had abandoned his vessel, it had opened a breach between the two Acts. As long as courts were faced only with a suit against a negligent owner, they could indulge in a broad reading of the "privity or knowledge" exception to deny limitation.[20] They thus appeared to repair the breach.

The Court also announced in *Wyandotte*, however, that the United States could sue for reimbursement of wreck removal expenses against a party negligently responsible for the wreck. In cases involving a negligent party who does not own the wreck, the "privity or knowledge" exception is not available merely from evidence that the non-owner has failed to remove. The choice is thus whether to opt for another expedient or, rather, to recognize the full

**19.** The Second Circuit has said: "We can think of no sensible reason why Congress should have desired that if the executive branch chooses to effect immediate removal of an obstruction . . . rather than resort to the slower injunctive process of the courts, the offender should thereby escape his due . . ." *United States v. Perma Paving Co.*, 332 F.2d 754, 757 (2d Cir. 1964).

**20.** Professors Gilmore and Black are characteristically insightful in appraising the fate of the phrase, "privity or knowledge." Linking this phrase with one from § 182 of the Limitation Act (the "fire statute"), they observe:

"Privity or knowledge" and "design or neglect" are phrases devoid of meaning. They are empty containers into which the courts are free to put whatever content they will. The statutes might quite as well say that the owner is entitled to exoneration from liability or to limitation of liability if, on all the equities of the case, the court feels that that result is desirable; otherwise not. Since, in

the infinite range of factual situations no two cases will ever precisely duplicate each other, no judge with the slightest flair for the lawyer's craft of distinguishing cases need ever be bound by precedent: "privity like knowledge," the Supreme Court has remarked, "turns on the facts of particular cases."
Judicial attitudes shape the meaning of such catchword phrases for successive generations. In the heyday of the Limitation Act it seemed as hard to pin "privity or knowledge" on the petitioning shipowner as it is thought to be for the camel to pass through the needle's eye. To the extent that in our own or a subsequent generation the philosophy of the Limitation Act is found less appealing, that attitude will be implemented by a relaxed attitude toward what constitutes "privity or knowledge," "design or neglect." The Act, like an accordion, can be stretched out or narrowed at will.
G. Gilmore and C. Black, supra, note 5, at 877 (citation omitted).

extent of the conflict between these two statutes. We choose the latter course.

We hold that the Limitation Act does not apply to the government's civil suits under § 15 of the Rivers and Harbors Act for wreck removal expenses against parties negligently responsible for the wreck.[21]

### III.

Our conclusion that the Limitation Act does not shield the appellants, should they be found negligent, from an in personam action by the government for wreck removal expenses finds support in recent caselaw and is not controverted by the relevant legislative history. At the same time, appellants have cited no case in which the government has sued for wreck removal expenses and a negligent party has successfully invoked the Limitation Act. Because a holding that appellants can limit their liability in this situation would be without precedent, appellants call upon us to extend the Limitation Act into an area of liability it has not heretofore touched. We decline appellants' invitation to find the Limitation Act applicable to the government's suit for wreck removal expenses. We think the Rivers and Harbors Act implicitly limits the scope of the Limitation Act.

In *Hines, Inc. v. United States*, 551 F.2d 717 (6th Cir. 1977), *modified on rehearing*, the court declined a similar invitation to subordinate the purposes of the Rivers and Harbors Act to the Limitation Act. The court announced: "[W]e hold that the statute later in time (The Rivers and Harbors Act) served to amend the unlimited language of the 1851 Limitation of Liability Act." 551 F.2d at 718. Although *Hines* did not involve the precise question facing this court today, that decision lends support to our result.

In *Hines*, the owner of two barges that struck a dam and locks, then caught fire and sank, sought to limit its liability for damages to the dam and locks and for the expenses of removing the barges from the river. Noting that *Wyandotte* "establishes

that the government has a right to in personam relief against the owner of a vessel for the negligent sinking of such vessel in the navigable waterways," the court denied limitation for both wreck removal expenses and damage to the locks and dam. 551 F.2d at 720. The court observed that although *Wyandotte* had expressly reserved decision on the effect of the Limitation Act, "courts and commentators have read it as implying that in personam liability could *not* be so limited in a Wreck Act case." The court cited for this proposition, among other authority, the district court's decision in the case at bar. 551 F.2d at 723.

With respect to the claim for wreck removal expenses, however, because the limitation claimant was the owner of the wreck, the Sixth Circuit was able to rely on prior decisions holding that a negligent owner lacks "privity or knowledge." The *Hines* court thus did not have to face the more difficult question whether a negligent shipowner who did not own the wreck was similarly precluded from limiting its liability.

Another apparent ground of decision in *Hines* does by implication speak to this latter question. The court noted that "[p]ublic policy forbids that a person liable to a fine or penalty under the criminal laws should be permitted to limit or reduce his liability by claiming the benefit of the shipowner's limitation statutes." 551 F.2d at 724, *quoting* 3 Benedict on Admiralty § 32, at 4–7 (7th ed. 1975).

 Appellants in the case at bar, should they be found negligently to have caused the sinking of the A. MacKenzie, will have been in violation of the first clause of § 15, which makes unlawful "voluntarily or carelessly . . . caus[ing] to be sunk, vessels . . . in navigable channels." Consequently appellants would be criminally liable under § 16, 33 U.S.C. § 411. The policy rule cited by *Hines* would therefore foreclose to appellants any hope of limited liability. This principle of "pub-

---

21. We do not limit "negligent parties" to mean only those who are personally involved in the

§ 15 violation and thus have "privity or knowledge."

lic policy" thus directly supports our conclusion that parties who negligently cause a wreck may not limit their liability in a civil suit under § 15 of the Rivers and Harbors Act.[21]

With respect to the claim for damages to the locks and dam, the *Hines* court directly addressed the conflict between the Rivers and Harbors Act and the Limitation Act. Finding the government's right to recover for such damage pursuant to § 16 of the 1899 Act apparently limited by the Limitation Act, the court held that the 1899 Act amended the 1851 Act. The court adduced two reasons applicable to the case at bar. First, it said that when the purposes of two statutes conflict, there are no cross-references, and the legislative history is silent regarding the possible conflict, the later statute amends the earlier.[22] *See* 2 A. Sutherland, Statutory Construction §§ 51.-02, 51.05 (4th ed. 1973). Second, the court adverted to the broad policy grounds that undergird the *Wyandotte* decision. Fairness dictated that the negligent party bear the loss. Allowing appellant to invoke the Limitation Act would merely reinstate at another level the limitation on a negligent party's liability that *Wyandotte* had removed by authorizing an in personam suit. The result would be that which *Wyandotte*

sought to avoid—a party's shifting the loss arising from its negligence onto its victim:

> In this case it is obvious that if the Limitation of Liability statute be so construed as to terminate in personam liability on the part of appellant *Hines*, there would be no possibility for the government to recover the bulk of its damages . . .

*Hines, Inc. v. United States, supra*, 551 F.2d at 726.

Similarly, in *United States v. Ohio Valley Co., Inc.*, 510 F.2d 1184 (7th Cir. 1975), the court held a claim under § 14 of the Wreck Act non-limitable even though no one argued that the responsible parties had "privity or knowledge." The court canvassed previous decisions, including *Chinese Maritime*, that were premised in part on the notion that failure to remove was per se within the knowledge and privity of the wreck's owner. The court nevertheless found "considerable language in those cases finding the application of the Limited Liability Act to the Rivers and Harbors Act unwarranted." 510 F.2d at 1187.[23] Like the court in *Hines*, the court in *Ohio Valley* stressed that to apply the limitation of liability provisions to the wreck statute would be "inconsistent with the purpose of the [Wreck Act] to protect, preserve and make

---

**21.** That this public policy is not limited to cases in which the limitation claimant is in "privity or knowledge" of the criminal violation, *cf. The Snug Harbor*, 53 F.2d 407, 411 (E.D.N.Y.1931), aff'd *United States v. Eastern Transp.*, 59 F.2d 984 (2d Cir. 1932); *Eastern S.S. Corp. v. Great Lakes Dredge and Dock Co.*, 256 F. 497 (1st Cir. 1919), is apparent from the *Hines* court's applying it to the owner's limitation claim regarding damage to the locks and dam. 551 F.2d at 724–25. Unlike § 15, the section of the Rivers and Harbors Act that makes causing such damage unlawful does not impose a subsequent statutory obligation, such as the duty to remove the wreck, which the owner could be said to have breached. Section 14, Rivers and Harbors Act of 1899, 33 U.S.C. § 408 (1970).

We nevertheless disclaim any reliance on a per se rule that would preclude limitation upon any statutory violation that leads to penalty or fine. It may be, though we do not decide, that public policy does not foreclose limitation for some violations of a statute leading to criminal penalties or fines. It is sufficient for our pur-

poses that public policy is well-served by precluding limitation for liability arising from criminal violations of § 15 of the Rivers and Harbors Act. In any event appellants' fears that we preclude limitability for statutory violations leading only to civil fines are entirely unwarranted.

**22.** *But see Charles Nelson Co. v. Curtis*, 1 F.2d 774 (9th Cir. 1924), (Limitation Act was not repealed insofar as it applied to right of action given seaman under Merchant Marine Act of June 5, 1920, ch. 250, § 33, 41 Stat. 1007, 46 U.S.C. § 688, popularly known as the Jones Act).

**23.** For example, the court quoted from the district court's opinion in *Chinese Maritime Trust, supra*, 361 F.Supp. at 1178, regarding *Wyandotte's* lending "renewed vigor" to the Wreck Act and the corresponding "disfavor" with which courts viewed the Limitation Act. *United States v. Ohio Valley Co., Inc., supra*, 510 F.2d at 1187.

safe the nation's navigable waterways." *Id.* at 1188.

██ Finally, we note that the legislative history of the Limitation Act is consistent with the limitation we place on that Act today. Congress passed the Limitation Act in an era before the corporation, with its limited shareholder liability, had become the standard form of business organization and before the present range of insurance protection was available. There is serious question whether the Act retains vitality within the sphere in which it has traditionally applied; that is, of course, a matter for the legislature, not the courts.[24] Whether to extend the Limitation Act to a class of cases to which it has never applied is, however, a judicial question; we answer it today.[25] No court has subjected the government's recovery of wreck removal expenses to the Limitation Act. We decline to do so today.[26]

The stated purpose of the Limitation Act was to place this country's "mercantile marine upon the same footing as that of Great Britain." 23 Cong.Globe, 31st Cong., 2d Sess. 714 (Remarks of Sen. Davis, February 26, 1851). Senator Hamling of Maine, who introduced the bill, presented it as merely an adoption of English legislation: "Why not give to those who navigate the ocean as many inducements to do so as England has done? . . . That is what this bill seeks to do, and it asks no more." *Id.* at 715. Senator Hamling consistently reminded his colleagues that "this bill conforms to what is the law of England." *Id.* at 332 (January 25, 1851), 715 (February 26, 1851).

It is therefore significant that throughout the nineteenth century and, indeed, until recently, the law of Great Britain has been that the limitation of liability afforded shipowners does *not* extend to shipowners' liability for wreck removal expenses.[27] *See The Stonedale No. 1* [1954] 2 All E.R. 170, aff'd by the House of Lords [1955] 2 All E.R. 689; *The Brabo,* [1947] 2 All E.R. 363, 370; aff'd sub nom. by House of Lords, *Tyne Improvement Comm'rs v. Armement Anversois S/A* [1949] 1 All E.R. 294; *The Millie* [1939] Li.L.Rep. 318.[28] Hence it is

24. Professors Gilmore and Black write:
 During the [past] twenty years the limitation principle has been attacked by many and defended by almost none . . . The holdings in the limitation cases which have been decided since the mid-1950's have, with a few exceptions, been adverse to the petitioning shipowner. In the low review [sic?] literature the argument that the Limitation of Liability Act has served its time and should be repealed has become a commonplace.
 G. Gilmore & C. Black, note 5 *supra,* at 822.

25. In 1954 Justice Black, speaking for four members of the Court in a case that impaired the authority of an early case that had granted limitation, observed:
 Judicial expansion of the Limited Liability Act at this date seems especially inappropriate. Many of the conditions in the shipping industry which induced the 1851 Congress to pass the Act no longer prevail.
 *Maryland Casualty Co. v. Cushing,* 347 U.S. 409, 437, 74 S.Ct. 608, 623, 98 L.Ed. 806, (1954) (dissenting opinion).

26. Compare the language of the court in *In re Petition of the Dodge, Inc.,* 282 F.2d 86, 89 (2d Cir. 1960):
 [W]e think that ambiguous language in statutory provisions relating to limitation of liability should be resolved in favor of interpretations increasing the instances where full

recoveries from the limiting vessel are possible.

27. The state of British law changed when in 1957 Britain signed the Brussels Convention on Limitation of Liability, October 10, 1957, which specifically made wreck claims subject to limitation. Britain brought its own statutory law into conformity by enacting the British Merchant Shipping (Liability of Shipowners and Others) Act, August 1, 1958. *See* 6A Benedict on Admiralty 623–51. The United States was not a signatory to the Brussels Convention.

28. In *The Brabo, supra,* [1947] 2 All E.R. at 370, Scott, L. J. made clear that the English tradition, as opposed to that on the Continent, was to exclude from limitation statutory causes of action for the recovery of wreck removal expenses:
 There is a further principle of legislative policy regarding maritime commerce, to which also this appeal invites public attention, that of limitation of shipowner's liability. That principle has been applied in the western world for two centuries or more, the basic rule on the continent making the value of the ship at the end of the voyage the limit of her owner's liability, whereas the United Kingdom in the middle of last century converted that measure into a stirling limit per ton of registered tonnage, based on the then

doubtful that Congress, in 1851 or in 1899, specifically intended the Limitation Act to apply where its English counterpart did not.

## IV.

 Statutes can be read complementarily or contradictorily, but always with a gloss of contemporary time and clime. These statutory relics have always been on display but we must now look at them from a point of view not heretofore clearly examined. Although we juridically transport ourselves to the nineteenth century—no mean navigational feat—we must not lose our contemporary compass. The shifting sands of time demand innovative interpretative analysis lest we come to rest on a shoal that did not threaten our grandfathers, but is only newly formed.

As the Supreme Court noted in *Wyandotte*, it would be surprising indeed if Congress intended to penalize the government for having performed its duty to keep a navigable channel clear, 389 U.S. at 205, 88 S.Ct. at 387, by limiting it to in rem rights that would not reimburse the United States for removal expenses, 389 U.S. at 202, 88 S.Ct. at 386. Our decision today merely effectuates the policies of the Rivers and Harbors Act as enunciated in *Wyandotte*.

To accord full effect to the Limitation Act by limiting the United States to an in rem recovery is merely to pour an old wine into a new bottle. That wine had already turned by 1967, in *Wyandotte*, and pouring it into a new vessel can have no felicitous effect on its potability. This is not to say that the Limitation Act no longer has any vitality. It is rather to say that its force succumbs to that of a later statutory enactment which, when still later construed by the Supreme Court in a manner that wars with the policies of the Limitation Act, must prevail over the earlier Act.

By enacting the Rivers and Harbors Act, Congress sought to keep our navigable streams navigable by authorizing the removal of obstructions placed thereon; in construing that statute in *Wyandotte*, the Court sought to ensure that the Act would cast the cost for removal on those who did the obstructing. To be sure, the Supreme Court did not make clear whether the negligent parties to bear the cost of removal could limit their liability for damages caused without their "privity or knowledge." We think it implied in the policy arguments deployed by the Court that such negligent parties cannot shift the losses caused by their negligence to the United States and, ultimately, its taxpayers. We think appellants' broad construction of the Limitation Act would impair the effectiveness of the Wreck Act. We think the latter Act more in the mainstream of modern jurisprudence. Having determined that the Limitation Act does not wreck the Wreck Act and the Wreck Act is not limited by the Limitation Act, we affirm.

We think the district court properly placed the loss on the negligent party for consequences of its negligence and correctly declined to penalize the United States for having eschewed the slower injunctive process in favor of promptly removing the wreck. The judgment of the district court is

AFFIRMED.

---

average value of ships. On the continent the cost of wreck-removal, when recoverable from the owner of the ship, has always been treated as one of the marine liabilities of the voyage and, as such, has been brought within the continental system of limitation of ship-

owners' liability. In the United Kingdom that has never been the case.

For a general summary of applicable pre-1851 limitation law, see *"The Main" v. Williams*, 152 U.S. 122, 14 S.Ct. 486, 38 L.Ed. 381 (1894).